# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| RAYVENN D. ORTIZ, | ) | CASE NO. 4:15cv1085 |
| | ) | |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION AND |
| | ) | ORDER |
| SHEROD D. HOLMES, JR., et al., | ) | |
| | ) | |
| | ) | |
| DEFENDANTS. | ) | |

Before the Court is the motion of defendants Dawn DiBenardi ("DiBenardi") and Mahoning County Operators of the Mahoning County Juvenile Justice Center ("MCOJJC") (collectively "moving defendants") for partial judgment on the pleadings, pursuant to Fed. R. Civ. P. 12(c) (Doc. No. 10 ["Mot."]). Plaintiff Rayvenn Ortiz ("plaintiff" or "Ortiz") opposes the motion (Doc. No. 13 ["Opp'n"]), and moving defendants have filed a reply (Doc. No. 14 ["Reply"]). For the reasons that follow, the motion is converted to a Rule 12(b)(6) motion for partial dismissal and is granted.

## I. BACKGROUND

The background facts set forth herein are either undisputed or taken from plaintiff's First Amended Complaint ("FAC"). (Doc. No. 6.) On June 5, 2013, plaintiff, then 15 years old, was adjudicated a delinquent child by the Mahoning County Court of Common Pleas—Juvenile Court Division, and was placed on probation. (FAC ¶¶ 5, 10-11.) DiBenardi, a probation officer employed by the Mahoning County Juvenile Court ("Juvenile Court"), was

assigned to plaintiff's case.[1] (*Id*. ¶¶ 7, 12.)

At all times relevant to the present dispute, defendant Sherod Holmes, Jr. ("Holmes") was also employed by the Juvenile Court as a probation officer. (*Id*. ¶ 6.) It is alleged that Holmes used his position with the Juvenile Court to obtain confidential information about plaintiff that he used to "make contact with [plaintiff] in social settings." (*Id*. ¶¶ 13-14.) "After making initial contact with" Ortiz, Holmes "deceived [Ortiz] on his age and position as a probation officer in order to engage in a sexual relationship with" her. (*Id*. ¶ 15.)

Upon enrolling for classes at Mahoning Valley High School, plaintiff "learned the true identity of" Holmes and that "he was a probation officer with the Mahoning County Juvenile Justice Center." (*Id*. ¶ 17.) Thereafter, Holmes frequented the high school, removed plaintiff from classes, and "transported her using a Mahoning County vehicle to engage in sexual relations at his personal residence." (*Id*. ¶¶ 18-20.) Plaintiff alleges that DiBenardi knew of Holmes's illicit sexual relationship with plaintiff, failed to report it to the proper authorities, and permitted Holmes to use her county vehicle to facilitate Holmes's sexual misconduct with plaintiff. (*Id*. ¶¶ 21-23.)

On March 12, 2013, Holmes was found guilty by the Mahoning County Court of Common Pleas of two counts of gross sexual imposition, in violation of Ohio Rev. Code § 2907.05(A)(1)(c)(1), a fourth degree felony, and two counts of importuning, in violation of Ohio Rev. Code § 2907.07(B)(1)(f)(3), a fifth degree felony. (*Id*. ¶ 25.) He was sentenced to a term of imprisonment of two years and was required to register as a sex offender. (*Id*. ¶ 26.)

On May 29, 2015, plaintiff filed the present action against Holmes, DiBenardi, the

---

[1]Moving defendants refer to Dawn DiBenardi as "Dawn DiBernardi."

Mahoning County Juvenile Justice Center ("Justice Center"), and various John Does. (Doc. No. 1 (Complaint ["Compl."]).) Brought under the umbrella of 42 U.S.C. § 1983, and relying on asserted violations of the Eighth Amendment, the original complaint raised claims against Holmes for the sexual assaults, against DiBenardi for failing to protect Ortiz from the assaults, and against the Justice Center for failing to monitor, supervise, and train Holmes. The filing of the initial complaint was immediately followed by a motion to dismiss brought by DiBenardi and the Justice Center. (Doc. No. 4 (Motion to Dismiss ["MTD"]).) The motion challenged the applicability of the Eighth Amendment to the claims raised in the complaint, and the plausibility of a constitutional claim against DiBenardi for failure to protect Ortiz. The motion also raised several immunity arguments, claiming that the various defendants were entitled to quasi-judicial, qualified, and/or sovereign immunity.

In lieu of filing an opposition to the motion to dismiss, Ortiz filed the FAC against defendants Holmes, DiBenardi, MCOJJC, and the John Doe defendants, with the individual defendants sued in their official and individual capacities. (FAC ¶¶ 6-8.) It is unclear from the FAC whether MCOJJC represents the previously sued Justice Center, the Juvenile Court, or Mahoning County, itself. What is clear is that the claims are no longer dependent on the Eighth Amendment. Instead, plaintiff's § 1983 civil rights claims are now couched in terms of Fourteenth Amendment violations, and the factual allegations supporting the claims appear to have been fleshed out in greater detail. Notwithstanding these revisions, the claims in the FAC still retain the essence of the constitutional claims raised in the initial pleadings.

The moving defendants acknowledge that the FAC cured certain deficiencies identified in the previously filed motion to dismiss but insist that it did not cure all of them.

3

(Reply at 113.) Carrying over from the motion to dismiss, the moving defendants argue that DiBenardi and Holmes are entitled to sovereign immunity to the extent they are sued in their official capacities as employees of the Juvenile Court. They also argue that Mahoning County, to the extent it has been sued in this action, is not *sui juris* and must be dismissed.

## II. STANDARD OF REVIEW

### A.  Conversion of Rule 12(c) Motion to a Rule 12(b)(6) Motion

Plaintiff suggests that the present Rule 12(c) motion is premature because not all of the defendants have filed an answer. Rule l2(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings. Fed. R. Civ. P. 12(c). Relying on cases that provide that pleadings are not "closed" until all of the defendants have filed answers or otherwise responded to the complaint, plaintiff argues that the pleadings remain open because Holmes has not yet filed an answer or moved for summary judgment. (Opp'n at 102 (citing, among authority, *Nationwide Children's Hosp., Inc. v. D.W. Dickey & Son, Inc. Employee Health & Welfare Plan*, No. 2:08-cv-1140, 2009 WL 5247486 (S.D. Ohio Dec. 31, 2009)).)

The Sixth Circuit has not directly addressed the issue of whether, when there are multiple defendants, a motion for judgment on the pleadings may be filed before all the defendants have answered the complaint so long as the moving defendants have answered. *See Dunn-Mason v. JP Morgan Chase Bank Nat'l Ass'n*, No. 11-cv-13419, 2013 WL 4084676, at *4 (E.D. Mich. Aug. 13, 2013). This Court, however, has recently had occasion to consider how a court should proceed under circumstances similar to those presented in this case.

In *Prade v. City of Akron*, No. 5:14CV188, 2015 WL 2169975 (N.D. Ohio May

4

8, 2015), this Court held that a Rule 12(c) motion that was prematurely filed before all defendants had answered could be converted to a Rule 12(b)(6) motion provided the issues raised in the motion were sufficiently raised in the moving defendant's answer as affirmative defenses. *Prade*, 2015 WL 2169975, at *2. In arriving at this conclusion, the Court relied on another recent decision out of the Western District of Michigan. In *Gillespie v. City of Battle Creek*, No. 1:13-CV-1320, 2015 WL 1459611, at *3 (W.D. Mich. Mar. 30, 2015), the court observed with favor the practice of district courts within the Sixth Circuit of permitting post-answer Rule 12(b)(6) motions, as well as the practice outside the Sixth Circuit of construing premature Rule 12(c) motions as Rule 12(b)(6) motions. *Gillespie*, 2015 WL 1459611, at *3 (citing, among authority, *Horen v. Bd. of Educ. of Toledo City Sch. Dist.*, 594 F. Supp. 2d 833, 840-41 (N.D. Ohio 2009) (noting that district courts have the discretion to construe a "pre-answer Rule 12(c) motion as a motion to dismiss for failure to state a claim under Rule 12(b)(6)")). Finding that the issues raised in the premature Rule 12(c) motion had been raised in the answer, and further finding that the plaintiff could point to no prejudice, the court determined that converting the motion to one under Rule 12(b)(6) was appropriate. *Prade*, 2015 WL 2169975, at *2.

The focal point of the present motion is the application of the Eleventh Amendment as a bar to certain of the asserted claims. This very issue was raised by the moving defendants in their answer as an affirmative defense. (Doc. No. 9 (Answer of DiBenardi and MCOJJC to First Amended Complaint ["Ans. FAC"]) ¶ 41.) The moving defendants also argue that Mahoning County, to the extent it has been sued, is not a proper defendant to these proceedings. In their answer, these same defendants denied the lynchpin allegation lodged against Mahoning County, and raised as an affirmative defense the argument that the complaint

fails to state a claim against one or more of the defendants. (*Id.* ¶¶ 6, 40.) While this second issue represents a closer call, the Court finds that both issues raised in the moving defendants' Rule 12(c) motion were previously raised in their answer to the FAC.

Additionally, the Court notes that Holmes has failed to file an answer, despite being timely served with the summons and complaint, and that the time to file such an answer has passed. It appears, therefore, that Holmes is in default. Under these circumstances, withholding a ruling on threshold matters, when they have been fully briefed by the parties that are actively participating in this case, would accomplish nothing more than unnecessarily delaying this action. The fact that plaintiff has had an opportunity to fully brief these issues also demonstrates that plaintiff would not be prejudiced by immediate consideration of the present motion, and plaintiff has not even argued that any prejudice would result.[2]

Accordingly, the Court concludes that the Rule 12(c) motion can properly be converted to a Rule 12(b)(6) motion.

**B.      Rule 12(b)(6) Standard**

The standard of review for a motion for judgment on the pleadings under Rule 12(c) of the Federal Rules of Civil Procedure is the same as for a motion to dismiss under Rule 12(b)(6). *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001) (citing *Grindstaff v. Green*, 133 F.3d 416, 421 (6th Cir. 1998)). A motion to dismiss under Rule 12(b)(6) tests the sufficiency of the pleading. *Davis H. Elliot Co., Inc. v. Caribbean Util. Co., Ltd.*, 513 F.2d 1176, 1182 (6th Cir. 1975). All allegations of fact by the non-moving party are accepted as

---

[2] Plaintiff has argued, however, that the fact that Holmes has not filed an answer creates a genuine issue of material fact. (Opp'n at 103.) Genuine issues of material fact are demonstrated through the discovery of disputed facts, and not through the failure of a party to answer.

true and construed in the light most favorable to that party. *See Grindstaff*, 133 F.3d at 421 (citing *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990)). The court, however, "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. Ohio*, 193 F.3d 389, 400 (6th Cir. 1999) (citing *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987)).

The sufficiency of the pleading is tested against the notice pleading requirements of Fed. R. Civ. P. 8. Rule 8(a)(2) provides that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Although this standard is liberal, Rule 8 still requires a complaint to provide the defendant with "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).[3] Thus, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570 (citation omitted).

---

[3] In her opposition brief, plaintiff suggests that the Court must determine whether the plaintiff can prove no set of facts in support of her claims. (Opp'n at 102.) This standard, first enunciated in *Conley v. Gibson*, 355 U.S. 41, 78 S. Ct. 99, 2 L. Ed. 2d 80 (1957), has been flatly rejected by recent Supreme Court rulings. *See Twombly*, 550 U.S. at 562-63 ("*Conley's* 'no set of facts' language has been questioned, criticized, and explained away long enough . . . and after puzzling the profession for 50 years, this famous observation has earned its retirement.")

### III. DISCUSSION

####    A.    Sovereign Immunity and the Eleventh Amendment

Moving defendants maintain that plaintiff's claims against Holmes and DiBenardi in their official capacities as employees of the Juvenile Court/and or the Justice Center are barred by sovereign immunity. "The desire to protect the solvency and dignity of the states motivates the doctrine of Eleventh Amendment sovereign immunity." *Lowe v. Hamilton Cnty. Dep't of Job & Family Servs*., 610 F.3d 321, 324 (6th Cir. 2010) (citing, among authority, *Hess v. Port Auth. Trans-Hudson Corp*., 513 U.S. 30, 52, 115 S. Ct. 394, 130 L. Ed. 2d 245 (1994)); *see Pucci v. Nineteenth Dist. Ct.*, 628 F.3d 752, 760 (6th Cir. 2010) ("States and the federal government 'possess[] certain immunities from suit in state and federal courts.'") (quoting *Ernst v. Rising*, 427 F.3d 351, 358 (6th Cir. 2005) (en banc)). "The doctrine 'flows from the nature of sovereignty itself as well as the Tenth and Eleventh Amendments to the United States Constitution." *Lowe*, 610 F.3d at 325 (citing *Ernst*, 427 F.3d at 358). The doctrine is subject to numerous exceptions, however, one of the most prominent being that "state instrumentalities that properly are characterized as political subdivisions, rather than arms of the state, are not entitled to sovereign immunity." *Id*. at 324-25 (citing *Ernst*, 427 F.3d at 358-59); *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977) (citations omitted).

The Court must, therefore, determine whether the Juvenile Court, and by extension the Justice Center, is an arm of the state and not merely a political subdivision that is not entitled to sovereign immunity. Such a determination involves a question of law. *See Barton*

*v. Summers*, 293 F.3d 944, 948 (6th Cir. 2002) (citation omitted). Resolution of this issue will also be dispositive of whether Holmes and DiBenardi may be sued in their official capacities, as official capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165-66, 105 S. Ct. 3099, 87 L. Ed. 2d 114 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 690 n. 55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)); *see also Brandon v. Holt*, 469 U.S. 464, 471, 105 S. Ct. 873, 83 L. Ed. 2d 878 (1985) ("a judgment against a public servant in his official capacity imposes liability on the entity that he represents") (quotation marks and citation omitted).

To answer the question of whether a juvenile court is an arm of the state and entitled to sovereign immunity, it is necessary to trace the evolution of the law in this area in the Sixth Circuit. In *Mumford v. Basinski*, the Sixth Circuit determined that a domestic relations court was an arm of the state of Ohio that enjoyed immunity from suit. *Mumford*, 105 F.3d 264, 269 (6th Cir. 1997) ("Consequently, an Ohio common pleas court is *not* a segment of county government, but an arm of the state for purposes of section 1983 liability and Eleventh Amendment immunity analyses.") (emphasis in original). In arriving at this conclusion, the circuit recognized that the domestic relations court was part of the state court system established by the Ohio Constitution, that supervisory responsibility for the court rested with the Ohio Supreme Court, and that the standards controlling election, residency, tenure, compensation, and eligibility of judges who served on the court were also dictated by the state constitution. *See Mumford*, 105 F.3d at 268-69 (citing Ohio Const. art. IV, §§ 4, 5, 6). Additionally, the Sixth Circuit relied upon the fact that the jurisdiction and employment of court personnel was

9

controlled by state statute, rather than by the commissioners for the county in which the domestic relations court sat. *Id*. at 269 (citing Ohio Rev. Code § 2305.01 *et seq*.) Along a similar vein, in 2000, the court was asked to determine whether a juvenile detention center was entitled to immunity from suit. In *Oswald v. Lucas Cnty. Juvenile Detention Ctr.*, the court held that "a county juvenile detention center is part of the juvenile court, which is an arm of the state." *Oswald*, 234 F.3d 1269 (6th Cir. Oct. 30, 2000) (Table), 2000 WL 1679507, at *2 (citing Ohio Rev. Code § 2151.34).

The Sixth Circuit revisited its decision in *Mumford* in 2003, after intervening law from the United States Supreme Court stressed that the question of which entity—state or county—would be responsible for satisfying a judgment was a paramount concern in determining whether an entity was an arm of the state. *See Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430, 117 S. Ct. 900, 137 L. Ed. 2d 55 (1997) (stating that "the question of whether a money judgment against a state instrumentality or official would be enforceable against the State is of considerable importance to any evaluation of the relationship between the State and the entity or individual being sued") (citations omitted); *Hess*, 513 U.S. at 48 (recognizing "the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations") (citations omitted). In *Alkire v. Irving*, the court called into question the "reasoning in *Mumford*, if not the result[,]" because that court did not consider whether the state would be legally liable for a judgment against the county court. *Alkire*, 330 F.3d 802, 812 (6th Cir. 2003) (citing *Hess*, 513 U.S. at 48; and *Doe*, 519 U.S. at 430). Ultimately, the court remanded the matter to the district court for consideration of this and other relevant factors in determining whether the county court of common pleas was an arm of the state. *Id*. at 813.

Plaintiff suggests that, in the wake of *Alkire* and intervening Supreme Court law, "the determination of whether or not the [sic] Mahoning County and its Juvenile Justice Center is an arm of the state remains an open question." (Opp'n at 104.) Moving defendants disagree, underscoring the fact that "while the Sixth Circuit Court of Appeals may have questioned the rationale of some of the older cases on the application of [Eleventh] Amendment immunity in these situations, the [court] has expressly stated that, despite this uncertainty, it has not decided that *Mumford* was incorrect and that these previous cases have not been overruled." (Reply at 114-15 (citing *Triplett v. Connor*, 109 F. App'x 94, 96 n.4 (6th Cir. 2004) (while acknowledging "some doubt about the continued validity of *Mumford's* reasoning" the court held that "[w]e have not, however, decided that *Mumford* was incorrect")).).

Moving defendants also note that, even after *Alkire*, district courts within the Sixth Circuit continue to rely on *Mumford* and *Oswald* in finding juvenile courts and juvenile detention centers in Ohio to be arms of the state and entitled to sovereign immunity.[4] *See, e.g., Burress v. Hamilton Cnty. Office of Child Support and Enforcement*, No. 1:14-cv-391, 2014 WL 2515413, at *3 (S.D. Ohio June 4, 2014) (juvenile court is an arm of the state and entitled to Eleventh Amendment immunity), *report adopted by* 2014 WL 4075949 (S.D. Ohio Aug. 14, 2014); *Hinton v. Teodosio*, No. 5:12 CV 1267, 2012 WL 5354584, at *6 (N.D. Ohio Oct. 29, 2013) (suit brought against officials of juvenile court in their official capacities was barred by the

---

[4] Plaintiff relies heavily upon the *S.J. v. Hamilton Cnty., Ohio*, 374 F.3d 416 (6th Cir. 2004), to support her argument that the Juvenile Court and the Justice Center should not be considered an arm of the state for purposes of Eleventh Amendment immunity. In *S.J.*, however, the court was confronted with the question of whether a juvenile *training* center—and not a juvenile *detention* center—was an arm of the state, a distinction that the Sixth Circuit made clear in its decision. *S.J.*, 374 F.3d at 422-23 (in distinguishing *Oswald*, the court noted that Ohio law vested with the county the authority to grant or deny the juvenile court's request to create a training facility, while the county was obligated to create a juvenile detention center upon the recommendation of the juvenile court) (citing Ohio Rev. Code §§ 2151.65 and 2152.41); *see Winston*, 2013 WL 684742, at *6 (distinguishing *S.J.* on the same grounds).

Eleventh Amendment) (citing *Mumford*, 105 F.3d at 269); *Winston v. Franklin Cnty.*, Case No. 2:10-CV-1005, 2013 WL 684742, at *6 (N.D. Ohio Feb. 25, 2013) (juvenile detention center entitled to Eleventh Amendment immunity); *Conner v. Catalano*, Case No. 1:10 CV 1860, 2010 WL 4316752, at *2 (N.D. Ohio Oct. 26, 2010) ("The current state of law, as set forth by the binding precedent of the Sixth Circuit opinions in *Mumford*, *Triplett* and *Oswald*, unequivocally states that a juvenile detention facility is part of the juvenile court, which is an arm of the state.") (quotation marks and citation omitted).

In 2010, the Sixth Circuit held that a district court was an arm of the state for purposes of sovereign immunity. *Pucci*, 628 F.3d at 763. While the decision related to "a court within Michigan's state judicial system[,]" and not a state court in Ohio, the Court finds the approach taken in *Pucci* instructive. *Id.* at 755. There, the plaintiff brought suit against the state district court, and the court's chief judge, after she was terminated from her position as court administrator. The Sixth Circuit determined that both defendants were entitled to the protections of the Eleventh Amendment. The court applied a four-factor analysis set forth in prior decisions. Specifically, the court considered:

> (1) The State's potential liability for a judgment against the entity; (2) the language by which state statutes and state courts refer to the entity and the degree of state control and veto power over the entity's actions; (3) whether state or local officials appoint the board members of the entity; and (4) whether the entity's functions fall within the traditional purview of state or local government.

*Id.* at 760 (quoting *Ernst*, 427 F.3d at 359) (further citation omitted).

While the court observed that the first factor—the State's potential liability— "will *generally* be the most important [factor]," the court emphasized that it was not the "sole criterion" for determining whether an entity is entitled to sovereign immunity. *Id.* at 761

(quotation marks and citations omitted, emphasis in original). The court explained that the twin reasons for granting a state sovereign immunity—"the desire not to infringe either a state's purse or its dignity"—require consideration of both the state's economic liability and the indignity of subjecting the state to the judicial process. *Id.* at 761 (quotation marks and citations omitted). Applying the four-factor test, and mindful of the "twin reasons" for sovereign immunity, the court determined that, "in certain cases—such as the one before us here—the last three factors may demonstrate that an entity is an arm of the state entitled to sovereign immunity despite the fact that political subdivisions and not the State are potentially liable for judgments against the entity." *Id.* at 762.

The Court need not decide whether it may continue to rely on prior Sixth Circuit cases finding Ohio county courts and detention centers to be arms of the state for purposes of sovereign immunity. Whether the Court relies on the prior rulings in *Mumford* and *Oswald*, or applies the four-factor test anew, the result is the same—the Juvenile Court and the Justice Center are arms of the State of Ohio, and DiBenardi and Holmes are entitled to immunity for any action against them in their official capacities.

*1. The State's Obligation to Pay any Judgment*

The moving defendants "concede that the state treasury will not pay for judgment in this case." (Reply at 118.) They insist, however, that this concession "does not defeat sovereign immunity" and underscore the fact that "application of the remaining factors [and consideration of the dignity of the state] demonstrate that Ohio common pleas courts, and in turn Ohio juvenile courts and juvenile detention centers, are arms of the state and entitled to sovereign immunity." (*Id.*) While this first factor clearly counsels against finding that the

13

Juvenile Court is an arm of the state, the Court agrees with the moving defendants that this does not end the inquiry.

2. *Treatment of the Juvenile Court by the State's Statutes and Courts and the Degree of State Control*

As was the case for Michigan courts in *Pucci*, Ohio common pleas courts are established by the Ohio Constitution as part of a unified, state-wide judicial system. *See S.J. v. Hamilton Cnty., Ohio*, 374 F.3d 416, 421-22 (6th Cir. 2004) (Ohio's court system is mandated to be uniform) (citing, among authority, Ohio Const. art. IV, § 5). Pursuant to Article IV, § 5(A)(1) of the Ohio Constitution, "the supreme court shall have general superintendence over all courts in the state." Ohio Const. art. IV, § 5. Similarly, the powers of the county common pleas courts and county juvenile courts are delegated by the Ohio General Assembly and codified in Titles XXI and XXIII of the Ohio Revised Code.

Plaintiff points out that Ohio Rev. Code § 2152.41 requires the county commissioners to fund the construction of a juvenile detention center. Indeed, § 2152.41(A) states that "[u]pon the recommendation of the judge, the board of county commissioners shall provide, by purchase, lease, construction, or otherwise, a detention facility that shall be within a convenient distance of the juvenile court."[5] Notwithstanding the county's funding obligations for the facility itself, the Ohio Revised Code also provides that "[a]ny detention facility established under section 2152.41 of the Revised Code shall be under the direction of a superintendent. The superintendent shall be appointed by, and under the direction of, the judge or judges. . . . The superintendent serves at the pleasure of the juvenile court . . . ." Ohio Rev. Code § 2152.42(A).

---

[5] The fact that the statute provides that the county commissioners *shall* provide or construct a juvenile detention facility at the request of the juvenile court is further evidence that the county's discretion is limited. *See* Ohio Rev. Code § 2152.42(A).

Because the Juvenile Court is under the direction of the Ohio Supreme Court, control over the Juvenile Court rests with the state. This factor favors sovereign immunity.

Additionally, the Juvenile Court controls the admission, removal, and transfer of juveniles to and from the Justice Center. Ohio Rev. Code § 2152.43(E). This lends further support to a finding that the degree of control of the state over juvenile courts and their detention centers favors a conclusion that they are arms of the state. The second factor clearly weighs in favor of sovereign immunity.

*3. Appointment of members to the Juvenile Court*

It is clear from the Ohio Constitution and relevant statutes that the State of Ohio has considerable control over the appointment and removal of the members of its judiciary. While state court judges are elected, similar to the Michigan procedure recognized in *Pucci*, "[i]n case the office of any judge shall become vacant . . . the vacancy shall be filled by appointment by the governor." Ohio Const. art. IV, § 13. Also, as in the Michigan system as noted by *Pucci*, judges in Ohio may be removed from office by concurrent resolution of the General Assembly. *Id*. § 17.

With respect to the Justice Center, plaintiff draws the Court's attention to the fact that the county, and not the state, must shoulder the burden of paying the operational costs for the facility. (Opp'n at 105 (citing Ohio Rev. Code § 2152.43).) She concedes, however, that it is the juvenile court that appoints the superintendent of a juvenile detention facility who "serves at the pleasure of the juvenile court." (*Id*. (citing Ohio Rev. Code § 2152.42(A)).) The superintendent is also responsible to, and under the direction of, the juvenile court. *Id*. In

15

addition, the superintendent appoints all employees of the facility whose salaries are set by statute. Ohio Rev. Code § 2152.42(B).

These facts, taken together, demonstrate that the state exercises control over the appointment and membership of the juvenile courts, and the juvenile courts, in turn, exercise control over the juvenile detention facilities that exist in each county.[6] Therefore, the third factor favors sovereign immunity. *See Pucci*, 628 F.3d at 763-64 (relying on similar facts to find that the third factor "heavily favors granting sovereign immunity").

4. *Whether the Juvenile Court's Functions Fall Within the Purview of State or Local Government*

The final factor, which requires inquiry into whether the functions of the government entity fall within the traditional purview of state or local government, also favors a finding that the Juvenile Court and the Justice Center are arms of the state and entitled to immunity. The "inquiry into the 'traditional purview' of state government stems from the importance of dignity in the origins of [the] sovereign immunity doctrine; if the agency in question carries out a long-recognized state function, it is a particular affront to a state to subject this agency to suit." *Pucci*, 628 F.3d at 764. In applying this final factor, the court in *Pucci* explained that:

> We have previously recognized that "[c]onsiderations of dignity are particularly relevant in a suit against a state court, which is the 'adjudicative voice' of the State itself." *Barachkov* [*v. 41B Dist. Ct*, 311 F. App'x 863, 868 (6th Cir. 2009)]. This respect for a state's dignity in Eleventh Amendment immunity analysis "is particularly true in the context of a court system that . . . is mandated by the state constitution to be uniform and to be supervised by one supreme court." *S.J.*, 374

---

[6] Michigan counties are also responsible for the operational costs of their courts. Though not discounting entirely the county's burden in funding the operation of the district court, the court in *Pucci* recognized that "the expenses of justice *are incurred for the benefit of the State* and only charged against the counties in accordance with old usage, as a proper method of distributing the burden." *Id*. at 763 (quotation marks and citations omitted) (emphasis in original).

> F.3d at 421-22 (discussing Ohio's unified court system); *see also Barachkov*, 311 [F. App'x] at 868 (quoting same in connection with Michigan's 41B District Court.) As noted above, Michigan's state constitution explicitly vests "the judicial power of the state . . . in one court of justice," headed by one supreme court with "general superintending control over all courts." Mich. Const. art. VI, §§ 1, 4. Our concern for the dignity of the state, therefore, also counsels in favor of granting sovereign immunity here.

*Id.* While not discounting the fact that the county was potentially liable for any judgment in the case, the Sixth Circuit concluded that such a consideration was "outweighed by the integrated role of Michigan's district courts within the state judiciary (as provided for by Michigan's Constitution and statutes), the degree of supervision and control that the Michigan Supreme Court and legislature exercise over those courts, the role of state actors in appointing and removing district court judicial officers, and the traditional state function the Nineteenth District Court carries out." *Id.*

Similarly here, because the Juvenile Court is a part of Ohio's integrated system of courts, established by state constitution and governed by state statutes, the dignity of the Juvenile Court is a significant concern that cannot be overlooked. This final factor, therefore, weighs in favor of sovereign immunity.

Ultimately, the Court finds that the importance of the county's responsibility for any judgment in this case is outweighed by the other factors that clearly counsel in favor of sovereign immunity. As employees of the Juvenile Court, Holmes and DiBenardi are, therefore, entitled to immunity to the extent they are sued in their official capacities.

**B.     Plaintiff's Claims against Mahoning County**

Moving defendants insist that "there is no entity known as 'Mahoning County Operators of the Juvenile Justice Center.'" (Mot. at 90.) They further suggest that, to the extent

17

that plaintiff intended to bring suit against Mahoning County, such an attempt should fail because counties are not *sui juris*. As to this latter point, moving defendants posit that "[i]t is well settled that a 'county' is nothing more than a subdivision of a state, organized for judicial and political purposes. As such, counties are not legal entities capable of either suing or being sued." (*Id*. at 90-91 (collecting cases).) The moving defendants argue that, even if Mahoning County were capable of being sued under federal law, it would be subject to dismissal because the county does not possess any authority over the juvenile courts. (*Id*. at 91.) Plaintiff does not challenge the representation that MCOJJC does not exist, nor does she take issue with moving defendants' representation that the Justice Center is not under the supervision of the county. Instead, she maintains that the question of whether a county can sue and be sued under Ohio law is not dispositive of whether it can be sued under 42 U.S.C. § 1983.

The question of whether a county's lack of capacity to sue or be sued under Ohio law "precludes the ability of such county to become amenable to a § 1983 claim pursuant to *Monell*" has been dealt with "inconsistently" by Ohio federal district courts. *Stack v. Karnes*, 750 F. Supp. 2d 892, 894-95 (S.D. Ohio 2010) (collecting case for and against finding a county capable of being sued under § 1983). This Court need not weigh in on this issue because, even if Mahoning County were capable of being sued in this federal action, it would be entitled to dismissal for plaintiff's failure to state a cause of action against it.

The FAC provides that "Mahoning County, through its Juvenile Justice Center," failed to adequately train employees (FAC ¶ 54), failed to adequately monitor its employees (*id*. ¶ 55), failed to investigate and respond to complaints about sexual harassment (*id*. ¶ 56), maintained a policy, practice or custom of exonerating probation officers regarding complaints

of misconduct (*id.* ¶ 57), maintained a policy of failing to seek criminal prosecution of probation officers who engage in unlawful behavior (*id.* ¶ 58), and should have instituted a training program to instruct probation officers about the impropriety and illegality of sexual harassment (*id.* ¶ 59).

All of the above allegations of wrongdoing leveled against Mahoning County hinge on plaintiff's assertion that "Defendant, Mahoning County, is the government entity or political subdivision that by and through its agents, employees and contractors, is responsible for the operation of the Mahoning County Juvenile Court and Mahoning County Juvenile Justice Center located in Mahoning County, Ohio." (*Id.* ¶ 8.) Moving defendants argue that "[t]his 'factual' allegation is nothing more than a blatant misstatement of Ohio law and should not be entitled to an inference of truthfulness." (Mot. at 91.) The Court agrees. As set forth more fully above, the Ohio Constitution clearly provides that all supervisory responsibility for the Juvenile Court falls to the Ohio Supreme Court, an arm of the State of Ohio. Ohio Const. art. IV, § 5(A). The operation of the Justice Center, in turn, is entrusted to the superintendent, who is selected by and responsible to, the Juvenile Court. Ohio Rev. Code § 2152.42; *see also Oswald*, 234 F.3d at *2 ("Under Ohio law, a county juvenile detention center is part of the juvenile court, which is an arm of the state.") (citing Ohio Rev. Code § 2151.34). In light of this clear law demonstrating that the actual operation of the Justice Center is tasked to the superintendent (and the juvenile courts), the Court need not accept plaintiff's unwarranted factual inference to the contrary. *See Berrington v. Wal-Mart Stores, Inc*., 696 F.3d 604, 607 (6th Cir. 2012) (citing *Iqbal*, 556 U.S. at 678); *see also Jones v. Lucas Cnty. Sheriff's Med. Dep't*, No. L-11-1196, 2012 WL 1075180, at *2 (6th Cir. Mar. 30, 2012) ("legal conclusions couched as factual allegations do not need to be

accepted as true") (citing *Papasan v. Allian*, 478 U.S. 265, 106 S. Ct. 2932, 92 L. Ed. 2d 209 (1986)).

Because the Court cannot accept plaintiff's unwarranted assertion that Mahoning County is responsible for the operation of the Justice Center, all claims asserted against Mahoning County as a result of the operation of the Justice Center fail as a matter of law. Mahoning County is dismissed from this action.[7]

## IV. CONCLUSION

For all of the foregoing reasons, moving defendants' motion for partial judgment on the pleadings (Doc. No. 10) is converted to a Rule 12(b)(6) motion for partial dismissal and is granted. The claims against defendants DiBenardi and Holmes in their official capacities are dismissed. Additionally, all claims against Mahoning County are dismissed. Plaintiff shall have leave until February 2, 2016 to either move for default judgment against Holmes in his individual capacity or voluntarily dismiss him from the lawsuit. In the event that plaintiff fails to move for default judgment, Holmes shall be dismissed from this action without prejudice.

**IT IS SO ORDERED**.

Dated: January 18, 2016

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

---

[7] Of course, plaintiff waived any challenge to moving defendants' argument that Mahoning County was not responsible for the operation of the Justice Center by failing to address this particular argument in her response brief. *See Humphrey v. U.S. Attorney Gen. Office*, 279 F. App'x 328, 331 (6th Cir. 2008) (A plaintiff must oppose a defendant's motion to dismiss or otherwise respond or he waives opposition to the motion); *Resnick v. Patton*, 258 F. App'x 789, 790-91 n.1 (6th Cir. 2007) (same).